By the Court.—O’Gorman, J.
The plaintiffs were building contractors, doing business in the city of Hew York under the firm name of Morton & Chesley, and on or about February 4, 1882, they entered into a written agreement with the defendant—“to tear out, alter and rebuild ” his premises known as 228-232 West Forty-second street, in this city, so that they should contain a complete first class apartment house of thirty-nine complete suits, in the same general style as to workmanship, &c., as that prevailing in “The Benedick” apartment house in Washington square. The work was to be done pursuant to certain specifications, “so far as the same were applicable thereto,” and in accordance with detailed plans to be prepared by McKim, Mead & White, defendant’s architects, and approved by the defendant. All work was to be done to the satisfaction of the defendant, and the whole was to be finished on July 1, 1882. The sum of $45,000 was to be paid to plaintiffs for their work, in monthly installments, on certificates of the architects, and the balance was to be paid on the final performance of the contract, and delivery of the premises to the defendant as contracted for.
The work was not, in fact, finished until February 28, 1883, when the premises were delivered to the defendant.
The defendant Harrison resided in Vermont, and never *317 gavo personal attention to the building while in progress. It does not appear that he was ever there, and he left the protection of his interest in the matter wholly to two persons who acted as his agents therein, named respectively George W. Ellis, his attorney, and Percival W. Clement, who guaranteed the defendant’s payments on the work, and entered into possession of the premises when completed and delivered up by the plaintiffs.
The defendant paid the plaintiffs $8,800 during the progress of the work, and this action was brought to recover from him $36,200, the balance claimed to be still due. The defense was, that the plaintiffs had failed to comply with important and substantial requirements of the contract; that the time fixed in the contract for the completion of the work, July 1, 1882, was of the essence of the contract; that in various other particulars the defendant, by reason of the negligence and unskillfulness of the plaintiffs as to material and substantial provisions of the contract, had been subjected to great loss and damage, amounting to $40,000, for which sum the defendant made a counter-claim.
Of these charges against the plaintiffs, of failure to comply with their contract, but two seem to be important and entitled to consideration as affecting this appeal. One was, that the plaintiffs failed to build a twelve-inch brick wall from the foundation to the top of the iron cornice or basement floor joist, as required by the specifications. It is not denied that in this respect, the strict letter of the specifications was not complied with. The brick wall was built only to the underside of the girder, on which the floor beams of the basement floor rested. This, defendant claims, was a material and substantial violation of the contract, disentitling the plaintiffs to any recovery ; that its effect was to allow of a depression in the second, third, fourth, and fifth floors of the building, of from one to one and one-half inches ; and that this mischief would not have occurred if the brick wall had been built to the top of the basement floor joist, as *318 required by the specifications. There was, on this subject, much conflict of testimony. Witnesses on the part of the plaintiffs testified that it would have been improper and unsafe to carry the twelve inch brick wall to the top of the basement floor joist ; that when the time came to do this work, it was found that to carry out exactly the terms of the contract, would have left the wall partition and everything resting on it in the five stories above, without any support, and would have jeopardized the whole building; that the course actually adopted, was the proper course ; that the depression of the floors above was not more than usually occurred in houses thus altered from one purpose to another; that it was not caused by the plan adopted, but. was the result of shrinkage of the wood from over-heating of the building, for which said Clement was responsible, and of the great additional weight of many new partitions, erected on the upper floors, while in the house, in its former state, few partitions or rooms had existed.
The testimony of Mr. Hill, the superintendent employed by the architects, was substantially to this effect: He was continuously, from day to day, observing the work as it progressed, and it was his duty to see that the work was done according to the plans and specifications. It was he who directed this deviation from the terms of the specifications, without any consultation with his employers, because, in his opinion, it was necessary, and any other course would have caused the whole building to settle.
As tending to show acquiescence, or waiver of objection on the part of the defendant, the plaintiffs proved that both of the defendant’s agents, Ellis and Clement, were frequent in their visits to the building, while it was in progress, and active in their criticism of the work; that their constant presence had placed them in a position where knowledge of all that was done there was within their reach, and that they, or either of them, must have known of the manner in which the provision of the contract, as to the twelve-inch wall, was being carried out.
*319 The learned trial judge submitted to the jury, as a question of fact, whether the plaintiffs had substantially performed their contract, or whether there had been any material variation from it without the consent of the owner or his agents, and, in his charge, correctly instructed the jury as to the rule of law applicable to the case, and his charge was in harmony with the authorities cited by the learned counsel for the defendant. In my opinion, the question was properly submitted to the determination of the jury.
The other ground of defense is the plaintiffs’ delay to complete the work on July 1, 1882, as required by the terms of the contract, whereas, the work was not in fact completed until February 28, 1883, seven months after-wards.
For this failure to comply with the terms of the agreement, plaintiffs offer this excuse. They say that they were embarrassed and delayed by changes of plan made by defendant’s agents, Ellis and Clement.
The intention of the parties to the contract was, it appears, at first that an elevator should be put in the building, of the kind known as the “Whittier” elevator, and which was used in the “ Benedick ” apartment house, During the progress of the work, and about May 23, 1882, Clement determined to use an “ Otis ” elevator instead, and this change rendered necessary some other changes of the plans, as they were originally formed. It is in evidence that when the plaintiffs were informed of this change to the “ Otis ” elevator, they had already made a contract for an elevator with the “Whittier Machine Company,” dated March G, 1882, and some necessary delay occurred before plaintiffs could relieve themselves from their contract with the “ Whittier Company.” This, they, at last, succeeded in doing; and on June 29, 1882, they made a contract with “ Otis Brothers.”
Testimony was also given, on behalf of the plaintiffs, to show that the completion of the building had been further delayed by a change made by defendant’s agents *320 as to the kind of water-closets to be put in. The architects at first determined on the closet known as the “ Bartholomew ” as being that kind in use in the “ Benedick.” They afterwards changed it to the “ Zane ” closet. Then, Clement finally required that the “Hellyer” plan should be used, which involved putting in a fine of pipe directly to the roof. This last choice,1 on the part of Clement, was not communicated to Chesley, one of the plaintiffs, until July 28, 1882, some days after the day fixed for the final completion of the building. It is also in evidence that these “ Hellyer ” closets as ordered, were not delivered to the plaintiffs until September 1882.
The learned trial judge submitted to the jury, with proper instructions, the question as to whether or not the plaintiffs had shown good reason or valid excuse for not completing the building at the day fixed by the contract, and whether, under all the circumstances of the case, they had completed it in reasonable time. No error, in my opinion, was committed therein. Both these questions were proper for the determination of the jury, and there was enough of evidence in the case to sustain their verdict.
The appellant’s exception to the refusal of the trial judge to charge “ that if they found that the contract has been substantially performed, they must allow the defendant such an amount as would be necessary to make the building conform to what the specifications required, was not well taken. The true rule of damages in the case at bar would be the difference in value between the house as it was in fact finished by the plaintiff, and as it would have been if he had accurately carried out the provisions of the contract' (Kidd v. McCormick, 83 N. Y. 391). As a means of ascertaining that difference, and as matter of evidence tending to that end, the inquiry as to the actual cost of making the building conform to the specifications, would not be, in the case at bar, material or relevant. It is manifest, that to raise this twelve-inch brick wall, now, to the top of the basement floor joist, might involve the *321 destruction of so much work already done, and the doing of so much work not originally contemplated by the parties, that such an inquiry could not give any rehable aid to the jury in ascertaining the difference in value, between the building, in a defective condition, and what would have been its value if no defect had existed.
This case seems to have been tried with care, and an exhaustive examination of all the facts which could give any light to the jury. The jury were also allowed to visit the building in question, and I see no reason to interfere with their verdict.
The judgment appealed from should be affirmed, with costs; and the order appealed from should also be affirmed, with $10 costs.
Sedgwick, Oh.. J., concurred.